# In re Complaint as to the Conduct of
## SIDNEY E. AINSWORTH,
### *Accused.*

(OSB 1430, SC 26817)

614 P2d 1127

Stanley C. Jones, Klamath Falls, argued the cause for the Accused. With him on the brief was Giacomini, Jones & Associates, Klamath Falls.

James R. Uerlings, Klamath Falls, argued the cause for the Oregon State Bar. On the brief was Donald R. Crane, Klamath Falls.

PER CURIAM.

## PER CURIAM.

This is a disciplinary proceeding by the Oregon State Bar charging the accused with (1) conduct involving a conflict of interest, (2) acquiring a proprietary interest in the subject matter of a legal controversy, (3) entering into a business transaction with a client with differing interests without full disclosure to the client, and (4) accepting employment when the exercise of his independent judgment on behalf of a client was, or was likely to be, adversely affected.[1]

The Trial Board found the accused not guilty of the first three charges, but guilty of the fourth charge, and recommended a public reprimand because of "the appearance of impropriety." The Disciplinary Review Board, based upon its own findings of fact, agreed with those conclusions and with that recommendation.

In a petition to this court to reject that recommendation the accused states that he "accepts the facts as stated by the Disciplinary Review Board and by the Trial Board," but contends that those facts do not support such conclusions and recommendation; that he should be found not guilty, and that this proceeding should be dismissed.

The Oregon State Bar, in its brief and on oral argument, contends that there was evidence to support all four charges and that "a public reprimand may not be sufficient." The facts as stated in the opinion by the Disciplinary Review Board are as follows:

"The accused represented one Lamb who held a Judgment Lien upon an undivided one-half interest in certain tenantable real property in Ashland. The

---

[1] The complaint also included a "cumulative" or "catch-all" charge. We find it unnecessary to consider that charge.

value of the property at the times material was some $12,500 to $15,000. The real property taxes had not been paid for four or five years, and the property was in jeopardy of tax foreclosure. The amount of the Judgment Lien was in excess of $10,000. Lamb was, and for some time had been, indebted to the accused for some $6,000 in unpaid attorneys fees. The accused and Lamb had agreed that the accused would attempt to realize on this and/or other Judgment Liens to satisfy the attorneys fees indebtedness. One Rosenbaum, a resident of Idaho and the owner of the real property, desired to sell the property, and listed it with one Revel at an asking price of $15,000. Rosenbaum contacted the accused with respect to the status of the Judgment Lien, and inquired as to whether Lamb would accept one-half the sale proceeds in exchange for a release of the Judgment Lien. The accused was in favor of this solution, but his client, Lamb, the Judgment Creditor, was disinclined.

"One Herzman extended an offer to buy the property for $12,500, and signed an earnest money agreement conditioned (supposedly) upon satisfaction or release of the Judgment Lien. It was contemplated that the closure would go through escrow. This offer was forwarded to Rosenbaum, who then contacted the accused, again with respect to release of the Judgment Lien. Rosenbaum, perhaps erroneously, was under the impression that the Judgment Lien would be released, and the sale could be closed, by payment of one-half of the proceeds to Lamb. The accused sent release forms to Lamb for purposes of effecting the closure. Lamb again (and consistently thereafter) refused to sign the release forms. It is not clear whether his refusal was premised upon an assumption that his lien attached to all (as opposed to an undivided one-half) of the property, or because he felt the sales price was too low, or out of sheer onriness. Lamb was an elderly curmudgeon, who apparently drove a hard bargain in all of his many business dealings.

"Because of Lamb's obstreperousness, and perhaps for other reasons, Herzman refused to pay into escrow or deposit the purchase price. Rosenbaum hired an Idaho attorney who threatened suit if the sale did not go through. No one was paying, or was

willing to pay the real property taxes. The matter was becoming an impasse. On several occasions, the accused demanded, all be it unsuccessfully, that Herzman deposit the funds.

"In the meantime, Herzman had retained the accused to represent Herzman's interests in an entirely different real property matter. That matter was ultimately concluded on terms which, suffice it to say, produced ill-feelings between Herzman and the accused.

"Ultimately, the accused purchased the Ashland real property by paying to Rosenbaum one-half of the $12,500, reduced by the costs of sale and unpaid taxes, and the accused took title to the property subject to Lamb's Judgment Lien. Thereafter, he offered to convey the property to Herzman under the same terms that he had purchased it, but this offer was refused.

"The accused still held title to the property at the time of the hearing, and had made some improvements to the property. At the time of the hearing, the property was worth $33,000.

"Herzman complained to the Oregon State Bar, on this and on the other matter (handled by the accused for Herzman). Herzman's complaint with respect to this matter was the accused's purchase of the property as to which Herzman had extended an offer, supposedly without Herzman's knowledge or consent.[2] Neither Lamb (nor Lamb's estate after Lamb's death) complained of Ainsworth's conduct. In fact, the Lambs appeared to be entirely satisfied with the accused's handling of these affairs."

The "Supplemental Facts" as set forth in the Findings of Fact, Conclusions of Law and Recommendation of the Trial Board are as follows:

"1.  In connection with the proposed sale of the Ashland property from Robert Rosenbaum to Larry Herzman the accused at no time represented either of them. He represented Drew Lamb only. This was in

---

[2] Herzman also instituted a suit against the accused in the Jackson County Circuit Court to force the sale to Herzman. This suit terminated with a decree for the accused which is now on appeal.

connection with Lamb's judgment lien on an undivided one-half interest in the Ashland property. The fact of the accused's representation of Lamb in this respect was well known to both the proposed buyer and seller of the property.

"2.   The accused represented Lamb with the latter's informed consent. At Lamb's direction, the accused had the duty of attempting to collect on various judgments held by Lamb against other persons, of which the lien on the Ashland property was one. Proceeds from collections were to be applied on previously earned and unpaid attorney's fees which were owed by Lamb to the accused. The complaint makes no charge that the accused was guilty of misconduct in his dealings with his own client, Lamb.

"3.   Rosenbaum voluntarily conveyed the Ashland property to the accused. In connection with the sale, he had been receiving advice from his own attorney.

"4.   Before it was done, the accused discussed with Lamb the matter of the accused purchasing the property from Rosenbaum. The accused had no duty to Herzman to advise him of his intent to purchase. After he purchased, he kept open to Herzman for several months the same opportunity to buy the property on the same terms as were available from Rosenbaum. In view of Lamb's refusal to release the lien for the amount of money available on the proposed sale to Herzman, Herzman's prospects of purchasing the property on those terms was slight, if at all.

"5.   After the accused bought the property he paid the taxes and made some improvements to it. The Lamb estate still retained the judgment lien which is now upon the improved property at greater value. Lamb's estate has been benefited by the transaction.

"6.   While the accused was representing Lamb in regard to the proposed Rosenbaum to Herzman transaction and while Herzman and the accused were making different and contrary demands for trying to finalize the proposed sale, Herzman voluntarily sought to employ the accused, and the accused did undertake to do so on a matter not connected with the

sale. To represent adverse parties, even on unrelated matters, is prima facie a conflict of interest and is improper. Canons 4, 5, 7 and 9. We also note a complete absence in the record of any disclosure to Lamb that the accused was representing Herzman.

"7. Documentation through letters or otherwise by the accused of the events and of his handling of the matter leaves much to be desired. His dual capacity in representing Lamb in trying to collect the judgment and permitting it to be tied in with collecting his previous fee owed by Lamb to him was unwise. When tied in with the other events, it gave rise to an unfavorable appearance. Without this tie, the accused probably would not have bought the property. The appearance of impropriety is evident. Canon 9.

"It appears that neither Rosenbaum nor Herzman were harmed by the conduct of the accused. It also appears that Herzman would not have been able to acquire the property without paying the Lamb judgment in full or resorting to litigation. We find no violation of the accused legal duties to Rosenbaum or Herzman."

## 1. *Conflict of Interest.*

Among the findings of fact by the Trial Board which the accused "accepted," as previously stated, was a finding that:

"While the accused was representing Lamb in regard to the proposed Rosenbaum to Herzman transaction and while Herzman and the accused were making different and contrary demands for trying to finalize the proposed sale, Herzman voluntarily sought to employ the accused, and the accused did undertake to do so on a matter not connected with the sale. * * * We also note a complete absence in the record of any disclosure to Lamb that the accused was representing Herzman."

■ As stated by the Trial Board,

"To represent adverse parties, even on unrelated matters, is prima facie a conflict of interest and is improper."

DR 5-105 provides:

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"* * * * *

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

For a discussion of this disciplinary rule, *see In re Hershberger,* 288 Or 559, 606 P2d 623 (1980), and cases and authorities cited therein. We note, however, that although the brief of the Oregon State Bar relies upon and sets forth verbatim the provisions of other disciplinary rules, it does not set forth, cite or appear to rely upon DR 5-105.

Instead, the Bar, in its brief, contends that the representation of Herzman violated DR 7-104(A), which provides as follows:

"During the course of his representation of a client a lawyer shall not:

"(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

"(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client."

We also note that both the Trial Board and the Disciplinary Review Board found that the accused was

not guilty of the first charge of the complaint of the Oregon State Bar, in which facts constituting a conflict of interest, among other things, is alleged, but found him guilty only of the "appearance of impropriety" under DR 9-101, as later discussed. The apparent reason for these findings, as stated by the Disciplinary Review Board, was that "We do not believe that the evidence is clear and convincing (if any there be at all) that defendant was guilty" of the charge of a conflict of interest, as alleged in the first charge of the complaint.

It may be that the Disciplinary Review Board and the Trial Board reached this conclusion because DR 5-105 was not expressly relied upon by the Oregon State Bar. It is more likely, however, that they reached this conclusion based upon a finding that in representing Herzman in a matter not related to the underlying transaction, it was not "likely," within the meaning of DR 5-105(A), that the "independent professional judgment" in behalf of the accused on behalf of either Lamb or Herzman would be "adversely affected" by the proferred employment by Herzman. Based upon our review of the record, we agree with that conclusion.

It also appears from an examination of the first charge of the complaint that it does not very clearly charge the accused with a conflict of interest in violation of either DR 5-105 or DR 7-104(A), so as to give him a fair opportunity to defend himself against a charge of violating the terms of those disciplinary rules. Instead, the first charge of the complaint alleges all of the facts, including those realleged by reference in the second, third and fourth charges of the complaint, which more clearly allege violations of other specific disciplinary rules.

For these reasons, we agree with the findings by the Trial Board and the Disciplinary Review Board that the accused was not guilty of a conflict of interest in violation of the terms of DR 5-105 or DR 7-104(A).

Since the filing of the complaint in this case, and also since the findings and opinion by the Trial Board and the Disciplinary Review Board in this case, Section 15 of the Rules of Procedure for disciplinary cases has been amended to provide that complaints in such cases shall not only set forth "the acts or omissions of the accused," but also "the statutes, the canons, or the Disciplinary Rules violated," so as to enable the accused "to know the nature of the charge or charges against him."[3]

## 2. *Acquiring proprietary interest in subject matter of litigation.*

The second charge of the complaint alleges that "[i]n reference to the transactions described in the first cause of complaint, the accused acquired a proprietary interest in the subject matter in question." Both the Trial Board and the Disciplinary Review Board found the accused to be not guilty of this charge.

DR 5-103(A) provides:

"A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client * * *." (with certain exceptions not relevant to this case.)

It is clear from the facts found by the Trial Board and by the Disciplinary Review Board, as

---

[3] Section 15 of Rules of Procedure relating to admission, discipline, resignation and reinstatement now provides:

"If it shall appear to the board, from the report of a professional responsibility committee or otherwise, that grounds for public reprimand, suspension or disbarment exist against a member, the president or the board shall appoint counsel for the bar and a trial board, and shall cause to be prepared and filed by counsel with the executive director an original and three copies of a formal complaint against the accused in the name of the bar; and proceedings shall then be had thereon as hereafter provided. A formal complaint shall be signed by the executive director, or his designee, and shall set forth succinctly the acts or omissions of the accused, *including specifically the statutes, the canons, or the Disciplinary Rules violated,* so as to enable him to know the nature of the charge or charges against him. When more than one act or transaction is relied on, the allegations shall be separately stated and numbered. The complaint need not be verified." (Emphasis added)

"accepted by the accused," that Mr. Lamb, the client of the accused, had at least a potential "cause of action" to enforce a lien against the property which was the subject of this controversy and that the accused purchased that property in his own name.

It also appears to be true, as found by the Disciplinary Review Board, that the accused was then having an extremely difficult problem in collecting an attorneys fee from an obstreperous client; that he had previously "discussed with Lamb the matter of the accused purchasing the property from Rosenbaum; that after purchasing the property he offered to sell it to Herzman on the same terms as purchased by him; that his client, Mr. Lamb, never complained of his purchase of the property, and that no one was harmed by what he did.

In addition, it appears from the record (although not referred to by the Trial Board or the Disciplinary Review Board) that the accused testified, without contradiction, that before purchasing the property he not only discussed the matter with Mr. Lamb, but that two or three days later Mr. Lamb called him and "said he had been thinking about it and wanted me, if I would, to go ahead and buy the property." The accused also testified, again without contradiction, that before doing so he also called Mr. Hebert, General Counsel for the Oregon State Bar, and had the following conversation with him:

> "I told Mr. Hebert the problem about the fees and the impasse that had developed and what I had proposed to my client. And asked him if there was any ethical problem that I should concern myself about that I was not aware of. And he said he could see nothing wrong with the transaction as far as he was concerned. He directed me to phone Mr. Bill Duhaime, who was the chairman of the local ethics committee in Medford, Oregon to discuss the matter with Mr. Duhaime. I phoned on the very same day after talking to Mr. Hebert and discussed the matter with Mr. Duhaime, laying out the arrangement. And

again I was told, Mr. Duhaime told me that based upon the facts that I presented to him, he could see nothing or was not aware of any ethical problem with my proceeding as I had outlined to him."

This testimony was not controverted or otherwise questioned by the Oregon State Bar.

Both the Trial Board and the Disciplinary Review Board, apparently on the basis of these facts, found that the accused was not guilty of the second charge of the complaint and that the conduct of the accused constituted no more than "the appearance of impropriety."

It may be that the provisions of DR 5-103(A) (relating to the acquisition of an interest in litigation), which do not provide an exception in the event of consent by the client, as does DR 5-104 (relating to business relations with a client), prohibit the acquisition of such an interest even though consented to by the client because of the potential for conflict of interest and abuse of fiduciary responsibility. *Cf. In re Boivin,* 271 Or 419, 428, 533 P2d 171 (1975), and *In re Sandblast,* 210 Or 65, 307 P2d 532 (1957). We need not decide that question in this case. Neither need we decide whether consent by a client would be a defense to such a charge in the absence of independent legal advice.

■       In this case the accused not only sought and secured the express consent of his client, but also consulted with the general counsel of the Oregon State Bar and the chairman of the local ethics committee, and secured their apparent approval before proceeding to purchase the property. We do not mean to encourage consultation with the general counsel of the Oregon State Bar by suggesting that his or her advice can provide a defense to discipinary violations. It cannot. We believe, however, if there was any violation of DR 5-103(A) or DR 5-104 by the accused in this case, it was not of any great severity or magnitude, and that under the circumstances of this case, including the fact that

the accused sought the advice of the general counsel of the Oregon State Bar, he should not be disciplined by this court for any such violations.

3. *Entering into business transaction with a client.*

The third charge of the complaint alleges that:

"In reference to the transactions described in the first cause of complaint, the Accused then entered into a business transaction with his client while the Accused and his client had differing interests therein and while the client should have expected the lawyer to exercise his professional judgment therein for the protection of the client, said acts being conducted without full disclosure to the client or the client's knowing consent."

Both the Trial Board and the Disciplinary Review Board also found the accused to be not guilty of this charge.

DR 5-104(A) provides:

"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

It is contended by the Oregon State Bar that by his purchase of the real property which was the subject matter of the controversy, the accused violated DR 5-104(A), as well as DR 5-103(A), as previously discussed. We agree with the Trial Board and the Disciplinary Review Board, however, in their finding, in effect, that by the purchase of such property by the accused, under the facts and circumstances of this case, the accused did not "enter into a business transaction with a client," within the meaning of DR 5-104(A). As also previously stated, we believe that after securing apparent approval of his purchase of the property from the general counsel of the Oregon State Bar, the accused should not be reprimanded for doing so.

The Disciplinary Review Board found that the evidence was not clear and convincing evidence that the defendant was guilty of violating DR 5-104(A), as charged in the complaint. We agree with that finding.

## 4. *The appearance of impropriety.*

The fourth charge of the complaint is that:

"In reference to the transactions described in the first cause of complaint, the Accused then accepted employment when the exercise of his independent professional judgment on behalf of a client was, or was likely to be adversely affected by the acceptance of the employment."

DR 5-101(A) provides:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

On their face, these allegations appear to charge substantially the same conflict of interest as charged in the first charge of the complaint, as previously discussed.

Both the Trial Board and the Disciplinary Review Board, however, apparently construed and considered this allegation to be a charge of violating Canon 9, rather than DR 5-101(A).

Canon 9 provides:

"A lawyer should avoid even the appearance of professional impropriety."

DR 9-101 provides:

"DR 9-101 Avoiding Even the Appearance of Impropriety.

"(A)   A lawyer shall not accept private employment in a matter upon the merits of which he has acted in a judicial capacity.

"(B)   A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

"(C)  A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official."

█  In our opinion, the effect of this disciplinary rule is to define the more general terms of Canon 9 and to limit its application to the three specific situations described in DR 9-101(A), (B) and (C), none of which are applicable to the facts of this case. Indeed, the validity of Canon 9 as the basis of a complaint in a disciplinary proceeding might otherwise well be subject to question. *See Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980).[4]

We note that the brief submitted on behalf of the Oregon State Bar, although citing other disciplinary rules and Canon 9, makes no reference whatever to DR 9-101. We also note that the brief of the Oregon State Bar, although setting forth in a final footnote the provisions of DR 5-101(A), together with those of DR 5-103(A), 5-104(A), 7-104(A), and Canon 9, and although contending that specific conduct by the accused violated the provisions of DR 5-103(A), 5-104(A), and 7-104(A), makes no contention that any conduct by the accused violated the provisions of either DR 5-101, DR 9-101 or of Canon 9. Under these circumstances, we find the accused to be not guilty of violating either DR 5-101 or DR 9-101.

For these reasons and under these circumstances, the complaint of the Oregon State Bar is dismissed, with costs to neither party.

---

[4] The term "appearance of impropriety" is not only quite a general term, but it is not clear from the use of that term in Canon 9 whether that canon is intended to proscribe only conduct which has the appearance of impropriety because it may appear to constitute conduct proscribed by some other canon or disciplinary rule (such as conduct constituting an improper conflict of interest) or whether it is intended to proscribe conduct which may appear to be improper without reference to conduct proscribed by any other canon or disciplinary rule (such as being intoxicated in a public place).